Douglas LOGTERMAN and Kristi Logterman, Plaintiffs-Respondents,†

v.

Mary C. DAWSON, d/b/a Rolling Acres Mobile Home Park, Defendant-Appellant.

Court of Appeals

*No. 93–3005. Submitted on briefs July 27, 1994.—Decided December 7, 1994.*

(Also reported in 526 N.W.2d 768.)

†Petition to review denied.

92

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Richard Scholze* of *Konicek, Kaiser & Scholze, S.C.* of Burlington.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Randall R. Garczynski* of *Garczynski & Brennan Law Offices, S.C.* of Elkhorn.

On behalf of the Wisconsin Manufactured Housing Association, there was an Amicus Curiae brief by *Joshua L. Gimbel* and *Jonathan H. Margolies* of *Michael, Best & Friedrich* of Milwaukee.

Before Anderson, P.J., Brown and Snyder, JJ.

SNYDER, J. Mary C. Dawson appeals from a judgment for damages related to the termination of

Kristi and Douglas Logterman's mobile home tenancy. We hold that the tenancy of a mobile home resident may be terminated under § 710.15(5m), STATS., where state or local authorities require a park owner to either abandon a failing septic system serving the tenant's lot or replace the system, and the park owner elects to abandon the lot. Therefore, we reverse the judgment in favor of the Logtermans.

Dawson is the owner of Rolling Acres Mobile Home Park in Walworth county. The Logtermans owned a mobile home and leased a site in Rolling Acres. Sometime during the fall of 1991, the park began experiencing problems with the septic system servicing various sites, including the Logtermans'. After a September 20, 1991, meeting with officials from the Department of Industry, Labor and Human Relations, Dawson was informed that any failing septic system "must be abandoned or replaced within a reasonable amount of time." DILHR provided Dawson with a list of acceptable replacement options including: (1) connection to the public sewer, (2) temporary modification of the current system, (3) replace all failing systems with one system or (4) use of temporary or permanent holding tanks.

Park management initially addressed the problem by pumping the system servicing the Logtermans' site on a regular basis. In February of 1992, the Logtermans notified park management that they intended to sell their mobile home. Park management did not inform them at that time that there was a problem with the septic system. The Logtermans moved at the end of April 1992 because they had purchased a home in Delavan. Prior to that date the Logtermans never experienced any problems with the

septic system, such as sewage backup or problems with their drains.

At some point prior to May 5, 1992, Douglas Logterman accepted a verbal offer to purchase the mobile home from Ron DePriest for $29,500, contingent upon DePriest obtaining financing and upon Rolling Acres' acceptance of DePriest's rental application. DePriest was interested in purchasing the mobile home only if it could be occupied at its present location in Rolling Acres. Subsequently, DePriest stopped his loan application after park management told him that he could purchase the mobile home but would have to relocate it because the park did not believe it could supply adequate septic service to the site in the future.

On several occasions after the September 1991 meeting with DILHR, Assistant Sanitarian Jeffrey Selgren of the Walworth County Department of Planning, Zoning and Sanitation visited Rolling Acres in order to inspect the failing septic systems. "Some time in May" of 1992, Selgren gave Rolling Acres a verbal order to abandon or replace the failing system because "the system was failing to a point where it should not be used any more."

On May 5, 1992, park management informed the Logtermans that it intended to close the site which the Logtermans' mobile home occupied "based on the uncertain condition of the septic system serving that lot." Further, park management told the Logtermans that it had no objection to the mobile home remaining at the site while they were selling it, but that it would not permit any purchaser to occupy the mobile home at its present location in the park.

On August 6, Selgren issued a written order requiring Rolling Acres to replace or abandon all failing septic systems within thirty days. Selgren

recognized that Rolling Acres had been pumping the systems regularly, but that the park failed to resolve the problem on a permanent basis pursuant to DILHR's September 1991 directive and his verbal order of May 1992.

On August 21, 1992, the Logtermans initiated a lawsuit against Dawson alleging the following: (1) breach of contract for failure to provide an adequate septic system, (2) violation of a landlord's duties under § 704.07(2)(a)1-3, STATS., (3) illegal termination of tenancy in violation of § 710.15(5m), STATS., (4) refusal to rent to a mobile home purchaser in violation of WIS. ADM. CODE § ATCP 125.06(1)(d), and (5) that the park's actions constituted a prohibited practice in violation of WIS. ADM. CODE § ATCP 125.09(2).[1] Dawson argued that it was uneconomical to replace the septic system and she was therefore justified in abandoning the site pursuant to the state's and county's orders. The dispute was tried to a twelve-person jury, which found in favor of the Logtermans and awarded damages in the amount of $19,000.

The trial court denied Dawson's posttrial motion for judgment notwithstanding the verdict or, in the alternative, to change the jury's special verdict answers on insufficiency of the evidence grounds. The trial court also granted the Logtermans' posttrial motion for double damages and attorney's fees pursuant to § 100.20(5), STATS.[2] The trial court entered

---

[1] The Logtermans also alleged that Dawson breached a contract with DILHR to repair or replace the failing septic system to which they were third-party beneficiaries. The trial court dismissed this claim on Dawson's motion for summary judgment but denied summary judgment with respect to the other causes of action.

[2] Section 100.20(5), STATS., states:

judgment in the total amount of $48,277.50. Dawson appeals the judgment which incorporates the trial court's decision denying her postverdict motions. *See* RULE 809.10(4), STATS.

We begin with the relevant statutes. The Logtermans' primary argument is that Dawson terminated their lease in violation of § 710.15(5m), STATS., and refused to lease the lot to DePriest in violation of WIS. ADM. CODE § ATCP 125.06(1)(d). Section 710.15(5m) provides in relevant part:

> TERMINATION OF TENANCY OR NONRENEWAL OF LEASE. Notwithstanding ss. 704.17 and 704.19, the tenancy of a resident or mobile home occupant in a park may not be terminated, nor may the renewal of the lease be denied by the park operator, except upon any of the following grounds:
>
> . . ..
> (g) The park owner or operator is required to discontinue use of the park for the purpose rented as a result of action taken against the park owner or operator by local or state building or health authorities and it is necessary for the premises to be vacated to satisfy the relief sought by the action.
>
> . . ..
> (k) Other good cause.

WISCONSIN ADM. CODE § ATCP 125.06(1)(d) provides that no mobile home operator may "[r]efuse to rent a mobile home site to the purchaser of a tenant's mobile home except for a reason specified under s. 710.15(5m), Stats."

---

Any person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefore in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee.

Further, the Logtermans alleged that Dawson breached her duty as a landlord under § 704.07(2), STATS., for failing to provide adequate septic service. That statute provides in part:

> DUTY OF LANDLORD. (a) Unless the repair was made necessary by the negligence or improper use of the premises by the tenant, the landlord is under duty to:
>
> 1. Keep in reasonable state of repair portions of the premises over which he maintains control;
>
> 2. Keep in a reasonable state of repair all equipment under his control necessary to supply services which he has expressly or impliedly agreed to furnish to the tenant . . ..

On appeal, as in her motions after verdict, Dawson argues that the undisputed facts elicited at trial are insufficient to permit recovery as a matter of law. We review a trial court's denial of a motion for judgment notwithstanding the verdict (JNOV) de novo, applying the same standards as the trial court. *See Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1195 (7th Cir. 1992). A motion for JNOV may be granted when " 'the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment.' " *Chevron Chemical Co. v. Deloitte & Touche*, 168 Wis. 2d 323, 331, 483 N.W.2d 314, 317 (Ct. App. 1992) (quoting § 805.14(5)(b), STATS.), *aff'd*, 176 Wis. 2d 935, 501 N.W.2d 15 (1993). A motion for JNOV does not challenge the sufficiency of the evidence to support the verdict, but rather whether the facts found are sufficient to permit recovery as a matter of law. *Id.*

A motion for JNOV presents the same determinations as those raised by a motion for directed verdict. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 120 Wis. 2d 591, 600, 357 N.W.2d 287, 292 (Ct. App. 1984), *rev'd on other grounds*, 127 Wis. 2d 127, 179 N.W.2d 525 (1985).

> A motion notwithstanding the verdict amounts to a post-verdict motion for a directed verdict. . . . It is, in a sense, a demurrer to the evidence. It admits the facts found but contends that *as a matter of law* those facts are insufficient, though admitted, to constitute a cause of action. [Emphasis added.]

*Id.* (quoted source omitted). Neither a termination of the Logtermans' tenancy nor a refusal to rent to a prospective purchaser is permitted unless the facts as found establish an exception under § 710.15(5m), STATS. Whether a set of facts is sufficient to meet an exception under the statute is a question of law which we review de novo. *See State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142, 143 (Ct. App. 1987).

In denying Dawson's motion for directed verdict, the trial court ruled that there was a factual dispute as to whether Dawson was required by government authorities to discontinue use of the site leased by the Logtermans. In denying Dawson's motion for JNOV, the court ruled that there was evidence from which the jury could conclude that other options were available to Dawson such that the lot did not have to be abandoned. We conclude that even when viewed in a light most favorable to the Logtermans, the evidence does not, as a matter of law, permit recovery under the facts and circumstances of this case. We therefore reverse the trial court's denial of Dawson's motion for JNOV.

The undisputed testimony at trial is that in September of 1991, DILHR identified the septic system serving the Rolling Acres lot leased by the Logtermans to be failing. As a result, DILHR informed Dawson that the system must be abandoned unless it was replaced within a reasonable time by a system approved by DILHR. The Logtermans on appeal contend that DILHR's letter amounted to an order.[3] Viewing the evidence in a light most favorable to the Logtermans, we must admit for purposes of Dawson's JNOV claim that DILHR's letter constituted an order.

According to § 710.15(5m)(g), STATS., a mobile home park operator may terminate the lease of a tenant when the park operator:

> is required to discontinue use of the park for the purpose rented as a result of action taken against the park owner or operator by local or state building or health authorities and it is necessary for the premises to be vacated to satisfy the relief sought by the action.

Here, Rolling Acres was required by DILHR to abandon the septic system unless it replaced it with another approved system. Again, viewing the evidence most favorably to the Logtermans, Dawson took no action to replace the system within a reasonable amount of time as required by the September 1991 order. Therefore, Dawson was required by DILHR to abandon the septic

---

[3] Dawson contends that the letter was merely a list of guidelines outlining acceptable methods for dealing with their failing septic system. Although DILHR's letter does not contain the word "order," Selgren testified that based upon his experience as an assistant sanitarian for Walworth county, the letter constituted an order to abandon the system or rehabilitate it.

system. The practical effect of the abandonment required discontinuing use of the site for the purposes rented and vacating the premises to satisfy the abandonment. Accordingly, under § 710.15(5m)(g), Dawson was justified in terminating the Logtermans' lease and the facts found do not, as a matter of law, permit recovery here.

■ The Logtermans contend, and the trial court held, that § 710.15(5m)(g), STATS., cannot apply because it provides that the park owner must be required to discontinue use of the *park*, as opposed to individual sites in the park, in order to justifiably terminate a tenancy. We cannot read the statute so narrowly. Under such a reading, a park owner would be precluded from abandoning a site as the result of government action no matter what the economic cost unless the owner sought to retire the park permanently from the rental market pursuant to § 710.15(5m)(f). As the amicus brief points out, such an outcome would be bad public policy because an owner might determine that the cost of providing services to an uneconomic portion of the park makes the entire park uneconomic, forcing the owner to close the entire park. This would exacerbate the already existing shortage of mobile home parks and needlessly terminate the tenancies of many more residents than would be terminated if merely a portion of the park were closed.[4] Clearly this was not the intent of the drafters of § 710.15(5m). A literal reading of a statute may be rejected if it would lead to an absurd or unreasonable result that does not reflect the legislature's intent. *State v. Young*, 180 Wis. 2d 700, 704, 511 N.W.2d 309, 311 (Ct. App. 1993).

---

[4] The Wisconsin Manufactured Housing Association submitted an amicus curiae brief on behalf of Dawson.

Further, § 710.15(5m)(k), STATS., allows the park owner to terminate a tenancy for "[o]ther good cause." We conclude that when a government authority requires a park owner to abandon a lot or lots within a park unless certain action is taken and the park owner chooses abandonment, the subsequent termination of the lease constitutes good cause under subsec. (5m)(k) as a matter of law. Were we to hold otherwise, a park owner could be faced with the absurd situation of a state order to close a lot versus a state statute requiring the park owner to keep the lot open. Again, we are unwilling to construe the statute such that it results in an absurd outcome. *See State v. Moore,* 167 Wis. 2d 491, 496, 481 N.W.2d 633, 635 (1992).

In denying Dawson's motion for directed verdict, the trial court explained:

> [The question is], did they terminate the lease or fail or refuse to rent to a prospective purchaser in violation of 710.15(5m)? And they didn't make such a violation if, in fact, the State ordered them to close those facilities, assuming that they could not do anything about that. And the jury will have to decide could they, in good faith, have provided septic so as to keep those open? If so, and since the State had made that as an alternative, the jury would then answer that they violated Section 710.15(5m).

The trial court's interpretation of the statute essentially denies Dawson the legitimate abandonment option granted by DILHR's order. Section 710.15(5m), STATS., does not impose a "good faith" requirement on Dawson to exhaust all replacement options before abandoning a site pursuant to state order. Under the

105

trial court's interpretation, Dawson would be forced to maintain the habitability of the site regardless of the economic feasibility of doing so. For the reasons already stated, we do not believe the statute supports such a rationale.

The Logtermans further argue that Dawson was not required to abandon the site; rather, it was her choice to abandon the site because the state gave her the option to rehabilitate the septic and she chose not to do so. Therefore, the Logtermans argue, the abandonment was "not something <u>necessitated</u> by the action of the [state] agency." We disagree. DILHR's order required Dawson to abandon the system or required her to replace the system. While the Logtermans disagree with the option chosen by Dawson to satisfy DILHR's order, it is the landlord, not the tenant, who must make the decision by virtue of his or her ownership interest in the land.

The Logtermans attempt to characterize this case as one involving an unscrupulous landlord taking advantage of an unknowing tenant. For example, they point to the fact that park management failed to inform them of the septic problem when they notified the park in February 1992 that they intended to move. They argue that park management wrongfully refused to lease the site to DePriest when he offered to purchase the mobile home. Further, they complain that park management never made a good faith effort to pursue options to remedy the problem, such as hooking up to the public sewer.

First, the Logtermans' arguments in general focus on the landlord-tenant relationship and virtually ignore the role of the third-party governmental agencies in this matter. The moment that DILHR identified

that the septic system servicing the Logtermans' site was failing, the future habitability of the site was in doubt. The government's action was adverse to *both* Dawson and the Logtermans—Dawson faced the potential loss of revenue from the property and the Logtermans faced the potential of having to move their mobile home to a new location. These adverse consequences were solely the result of the government's involvement and issuance of its order.

Second, the issues of when the Logtermans moved out of their mobile home and Dawson's refusal to lease the site to the potential new buyer have little or no relevance to the dispositive issue—whether Dawson violated § 710.15(5m)(g), STATS. After DILHR issued its order requiring Dawson to abandon the site unless she replaced the system in September 1991, Dawson could have abandoned the site immediately and the Logtermans would have been forced to move their mobile home. Instead, Dawson pumped the system regularly to maintain service until the Logtermans moved out in April 1992. The Logtermans had no greater or lesser rights before they moved than after. Similarly, after the order was issued, Dawson could not have agreed to lease the Logtermans' site to any new purchaser without a commitment to replace the septic system or full disclosure to the potential buyer that the site could be abandoned.

Third, the only rights the Logtermans have in relation to this dispute arise out of their lease with Dawson and the relevant statutes and corresponding administrative rules. The Logtermans' arguments that Dawson failed to notify them of the state order until after DePriest withdrew his offer and that Dawson never made a good faith effort to pursue replacement

options necessarily fail because such actions are not required under the lease or the law. Nothing in the lease or statute required Dawson to disclose DILHR's order provided that adequate service was maintained. This is underscored by the fact that the state only notified Dawson, the landowner, of the septic problem and not the individual tenants. Likewise, as we have explained, § 710.15(5m)(g), STATS., does not require a park owner to make a good faith effort to make state-ordered repairs prior to terminating a lease where the park owner is given the option by the state to abandon the site in the alternative.

As an alternative to their argument under § 710.15(5m), STATS., the Logtermans rely on their rights arising out of the landlord-tenant relationship. The Logtermans argue that the septic system "failed" as of September 1991 and therefore Dawson violated her duty under both § 704.07(2), STATS., and the lease to provide adequate septic service. We disagree.

In addressing this argument we must distinguish between the term "failed" and "failing." Selgren testified that a failing septic system is one that is "either discharging effluent to the ground surface or to a drainage tile or surface water or ground water." The park manager testified that effluent was bubbling out over the dry well in the fall of 1991. DILHR described the system as "failing" in its September 1991 letter. Selgren testified that he determined the septic was "failing" in the spring of 1992. Therefore, the undisputed evidence indicates that the system was "failing" at least since September 1991 until the Logtermans moved to their new home in April 1992.

However, there is no evidence in the record to conclude that the system "failed" prior to the Logtermans

moving out in April 1992. The term "failed" means "to stop functioning" or "to diminish in [capacity] to a point of inadequacy." WEBSTER'S THIRD NEW INT'L DICTIONARY 814 (unabr. ed. 1976). There is no evidence that the Logtermans did not receive adequate septic services while residing in their mobile home. Dawson dealt with the failing system by pumping it regularly in order to ensure adequate service. Kristi Logterman testified that she never experienced any sewage backup or problems with the drains. It was only sometime in May, after the Logtermans had moved out, that Selgren identified that the system was "failing to a point where it should not be used any more" and issued a verbal order to abandon the system or replace it.

Further, even accepting the Logtermans' argument that Dawson violated § 704.07, STATS., by failing to keep the septic in a reasonable state of repair, the law does not entitle the Logtermans to the remedy which they seek. Section 704.07(4) limits a tenant's remedy to rent abatement for the period of time the property is untenable or nonliability for rent for the term of the lease if the tenant is forced to permanently vacate. In this case, therefore, had Dawson breached her duty to provide adequate septic service such that the Logtermans were forced to move, the Logtermans' remedy under § 704.07 would be nonliability for the remaining lease amount.

However, § 704.07, STATS., does not entitle the Logtermans to damages representing the value of their mobile home as they alleged. Section 704.07 is separate and distinct from § 710.15, STATS., which specifically regulates mobile home park regulations. This is clear from the express language of § 704.07(1), which states

that "[n]othing in this section is intended to affect rights and duties arising under other provisions of the statutes." Any claim for wrongful termination of a mobile home lease or failure to lease a site to a potential buyer is governed by § 710.15(5m) and WIS. ADM. CODE CH. ATCP 125. The Logtermans therefore cannot use § 704.07 to force Dawson to replace the septic system where Dawson was justified in abandoning the system and terminating the lease under § 710.15. Likewise, the Logtermans cannot enforce provisions of their lease over a state order requiring the park owner to abandon the site.

In sum, because we conclude the facts as found are insufficient as a matter of law to constitute wrongful termination of a mobile home lease under § 710.15(5m), STATS., or failure to lease to a potential purchaser under WIS. ADM. CODE CH. ATCP 125, we hold that the trial court erred by not granting Dawson's JNOV motion. Accordingly, we reverse the trial court's judgment and remand to the trial court with directions to enter judgment in favor of Dawson in accordance with this opinion.

*By the Court.*—Judgment reversed and cause remanded with directions.