IN RE the PATERNITY OF LILY R.A.P.:

STATE of Wisconsin, Petitioner-Respondent-Cross Appellant, and

LISA R.P., Petitioner-Respondent,

v.

MICHAEL J.W., Respondent-Appellant-Cross Respondent.

Court of Appeals

*No. 95–2917. Submitted on briefs October 11, 1996.—Decided April 10, 1997.*

(Also reported in 565 N.W.2d 179.)

133

For the respondent-appellant-cross respondent the cause was submitted on the briefs of *Brian J. Henderson* of *Henderson & Levihn* of Milwaukee.

For the petitioner-respondent-cross appellant the cause was submitted on the briefs of *Jo-Ann Millhouse* of *Grant County Corporation Counsel* of Lancaster.

Before Dykman, P.J., Roggensack and Deininger, JJ.

ROGGENSACK, J. Michael J.W. appeals a judgment adjudicating him the father of Lily R.A.P., notwithstanding a jury verdict which found he was not Lily's father. The State and Lily's mother, Lisa R.P., cross-appeal the trial court's earlier denial of summary judgment and failure to give a requested jury

instruction on the presumption of paternity. Although we conclude summary judgment was properly denied, the trial court erred both when it changed the jury's finding that Michael was not Lily's father, and when it failed to give a jury instruction which included a rebuttable presumption of paternity based on the results of blood tests. Therefore, we reverse and remand with directions for a new trial.

## BACKGROUND

When Lisa was 18 years old, she worked as a nursing assistant in Michael's home several hours a day during the week. She became pregnant during that time, and gave birth to Lily on December 27, 1987, out of wedlock. In 1988, in order to establish her eligibility for welfare, Lisa gave the State the names of two possible fathers[1] for Lily, who were required to submit to blood testing.[2] HLA, red blood cell antigens and serum protein studies were performed on the blood samples locally, and another group of blood samples was sent to St. Louis for DNA analysis.

The results of the various tests performed in 1988 were set out in three documents. The first, dated August 11, 1988, reported only tests conducted locally: ABO, Rh, MNSs, Kell, Duffy, and Kidd red blood cell antigens, six serum proteins and HLA, A and B series. It stated that the probability of paternity of the combined tests was 97.71%. The second document, dated November 23, 1988, reported the DNA analysis with a probability of paternity of 95.9%. The final

---

[1] Initial blood testing eliminated the other male as a potential father for Lily.

[2] The types of tests that were then in common use were red blood cell antigens, serum proteins, human leukocyte antigen ("HLA"), and deoxyribonucleic acid ("DNA") tests.

paternity report combined[3] the probabilities from all 1988 tests. It concluded the statistical probability of paternity was 99.9%.

After a series of procedural steps irrelevant to this appeal, the original paternity suit was dismissed without prejudice. The current paternity action was initiated on November 1, 1993, after Lisa reapplied for welfare. In 1994, a new set of blood samples were drawn from Lisa, Lily and Michael and a DNA analysis was performed resulting in a probability of paternity of 99.69%. The State and Lisa moved for summary judgment. The trial court denied the motion because it found a question of fact was raised by Michael's

---

[3] Paternity testing is a process of exclusion rather than a process of identification, wherein the probability of exclusion or the probability of paternity is always stated as a percentage of less than 100% because all males in a given population are not tested. The maximum probability of exclusion that can be achieved differs for each type of blood test that examines genetic markers. For example, the ABO red blood cell antigen is the simplest test to run, but it has a maximum exclusion of only 20%. However, if it is combined with another genetic marking test, such as the MNSs test, which has a 31.6% maximum exclusion capability, the maximum exclusion rate from the combined effect of the two different red blood cell antigen tests increases to 45.3%. *See* Shapiro, et al., *The DNA Paternity Test: Legislating the Future Paternity Action*, 7 Journal of Law and Health 1 (1992–93).

If the tests do not exclude the putative father, then the probability of paternity is calculated based on the frequency with which specific genes occur in the general population. It is a statistical estimate of the likelihood that the putative father is the biological father. As with the calculation of the probability of exclusion, the probability of paternity will be increased, for all men not excluded, by the statistical cumulative effect of performing many different types of tests. *See id.*

averment that he had never had sexual intercourse with Lisa.

At trial, the State requested a jury instruction stating that Michael was rebuttably presumed to be Lily's father. The trial court refused to give the instruction. It concluded that because the statistical probability which resulted from the tests conducted in 1988 in the first laboratory was less than 99%, the instruction was not appropriate. The trial court did not consider that the probability of paternity was increased by combining the results of the tests done in the first laboratory with the DNA tests conducted in the second laboratory.

The jury found that Michael was not Lily's father. Michael moved for judgment on the verdict and the State and Lisa moved to change the verdict, or alternatively, for judgment notwithstanding the verdict. The trial court set aside the jury verdict on the ground that it was not supported by any credible evidence. The court reasoned that there was no evidence in the record that any person other than Michael, and the already excluded male, had access to Lisa during the conceptive period. The court further ordered that if the State could produce authority for holding the respondent in a child support action liable for the State's attorneys fees, then Michael was to pay $1,000.

## DISCUSSION

**Standard of Review.**

A grant or denial of summary judgment is an issue of law which we review *de novo*, applying the same methodology as the trial court. *Brownelli v. Mc*

*Caughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994).

■

This court also reviews a trial court's decision on a motion challenging the sufficiency of evidence to support a verdict *de novo*, applying the same standards as the trial court. *See Richards v. Mendivil*, 200 Wis. 2d 665, 670, 548 N.W.2d 85, 88 (Ct. App. 1996). The test for determining the sufficiency of the evidence is set forth in § 805.14(1), STATS.[4]

■

We review a trial court's denial of a motion for judgment notwithstanding the verdict (JNOV) without deference, using the same process as the trial court employed. *Logterman v. Dawson*, 190 Wis. 2d 90, 101, 526 N.W.2d 768, 771 (Ct. App. 1994).

■

Our review of a jury instruction challenge is limited to whether the trial court acted within its discretion when it framed the instruction. *State v. Wilson*, 180 Wis. 2d 414, 420, 509 N.W.2d 128, 130 (Ct. App. 1993). We will reverse and order a new trial only if the instructions, taken as a whole, communicated an incorrect statement of the law or otherwise probably misled the jury. *Miller v. Kim*, 191 Wis. 2d 187, 194, 528 N.W.2d 72, 75 (Ct. App. 1995).

## Summary Judgment.

---

[4] Section 805.14(1), STATS., states:

No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

When reviewing a grant or denial of summary judgment, we first examine the complaint, to determine whether it states a claim. Then we review the answer, to determine whether it presents a material issue of fact or law, or whether the moving party is entitled to judgment as a matter of law. *Brownelli*, 182 Wis. 2d at 372, 514 N.W.2d at 49. If judgment is not then appropriate, we examine the moving party's affidavits, to determine whether that party has made a *prima facie* case for summary judgment. *Id*. If it has, we review the opposing party's affidavits "to determine whether there are any material facts in dispute which entitle the opposing party to a trial." *Id*. at 372–73, 514 N.W.2d 49–50.

This court has recognized that a summary judgment of paternity may be appropriate in some instances. *State v. Randy J.G.*, 199 Wis. 2d 500, 507–08, 544 N.W.2d 926, 929 (Ct. App. 1996). In *State v. J.L.T.*, 149 Wis. 2d 548, 439 N.W.2d 829 (Ct. App. 1989), for example, this court determined that the statutory presumption of paternity arising under § 767.48(1m), STATS., coupled with a mother's uncontradicted testimony that the respondent was the only possible father, was sufficient to merit a directed verdict despite the respondent's attacks on the mother's credibility.[5] However, in *Randy J.G.*, this court concluded that blood tests were insufficient to establish paternity for summary judgment purposes when it had not been established that the respondent "had intercourse with the mother during the conceptive period," and there was "sufficient evidence to permit a

---

[5] The methodology for a directed verdict is similar to that used in summary judgment in this context. *State v. Randy J.G.*, 199 Wis. 2d at 508, 544 N.W.2d at 929.

reasonable trier of fact to conclude that the mother had sexual intercourse with an untested person during a time conception could have occurred." *Randy J.G.*, 199 Wis. 2d at 509 and 512, 544 N.W.2d at 929 and 930. In no case has a Wisconsin appellate court affirmed summary judgment of paternity where the respondent denied having intercourse with the mother at any time.

Here, Michael did just that. Certainly, in the absence of the statutory presumption of paternity, Michael's assertion would create a genuine issue of material fact for the jury. The more difficult question is whether a mere denial of intercourse, where access during the conceptive period is established and no other potential fathers are identified, is sufficient to rebut the statutory presumption under § 767.48(1m), STATS., for summary judgment purposes. We conclude that it is. Although a jury need not make an independent determination of sexual intercourse before it can consider the results of a genetic test, *T.A.T. v. R.E.B.*, 144 Wis. 2d 638, 651, 425 N.W.2d 404, 410 (1988), it may do so. Indeed, the supreme court has already noted that "the reliability of the probability of paternity results may be diminished in cases where the occurrence of intercourse and the likelihood of conception at a given time are disputed." *Id.* at 649, 425 N.W.2d at 409. Because the non-occurrence of intercourse, if proven, would be sufficient to rebut the statutory presumption of paternity, summary judgment is inappropriate where the occurrence of intercourse is disputed. Therefore, the trial court correctly denied the motion for summary judgment.

## Sufficiency of the Evidence.

A motion to change the answer in a jury's verdict challenges the sufficiency of the evidence to support the verdict. Section 805.14(5)(c), STATS. This court begins its review of an order changing a jury's answer "with considerable respect for the trial court's better ability to assess the evidence." *Richards*, 200 Wis. 2d. at 671, 548 N.W.2d at 88. Nonetheless, we will reverse the trial court when the record reveals that it was "clearly wrong" about whether credible evidence supported the verdict. *Id.* at 671–72, 548 N.W.2d at 88. A verdict supported by credible evidence must stand, even when it is contradicted by stronger and more convincing evidence. *Weiss v. United Fire and Cas. Co.*, 197 Wis. 2d 365, 390, 541 N.W.2d 753, 762 (1995).

Under this standard, we must disagree with the trial court's evaluation of the evidence presented to the jury in this case. While we might consider the evidence of Michael's paternity convincing, as did the trial court, there was credible evidence to support the jury's verdict in the form of Michael's testimony that he never had intercourse with Lisa.[6] If the jury believed Michael on that point, then it could conclude that he was not Lily's father, regardless of the blood tests.

---

[6] While Michael's denial of any sexual relationship with Lisa might be improbable, it is not incredible. "Incredible evidence" is evidence in conflict with the uniform course of nature or with fully established or conceded facts. *Ferraro v. Koelsch*, 119 Wis. 2d 407, 411, 350 N.W.2d 735, 737 (Ct. App. 1984).

**Judgment Notwithstanding the Verdict.**

The trial court also concluded that the verdict could not stand because Michael did not identify any other potential fathers. Therefore, when it overturned the verdict, it also granted Lisa and the State's motion for JNOV. A motion for JNOV may be granted when "the verdict is proper but, for reasons evident in the record which bear upon matters not included in the verdict, the movant should have judgment." *Logterman*, 190 Wis. 2d at 101, 525 N.W.2d at 771 (quoting *Chevron Chemical Co. v. Deloitte & Touche*, 168 Wis. 2d 323, 331, 483 N.W.2d 314, 317 (Ct. App. 1992)). A motion for JNOV does not challenge the sufficiency of the evidence to support the verdict, but is in actuality a postverdict motion for a directed verdict, which asserts that the facts found by the jury are insufficient to support a judgment, as a matter of law. Logterman at 101–02, 526 N.W.2d at 771.

We conclude, as a matter of law, that it is not necessary for the respondent in a paternity petition to produce evidence of who the real father is in order to sustain a verdict of non-paternity. The State has the burden to prove, by a clear and satisfactory preponderance of the evidence, that the respondent is the father. *State ex rel. Schlehlein v. Duris,* 54 Wis. 2d 34, 40, 194 N.W.2d 613, 616 (1972); § 767.455(5g), STATS. Once the jury has received credible evidence of non-paternity, its verdict may not be overturned, either on a challenge to the sufficiency of the evidence or a motion for JNOV. To hold otherwise would impermissibly shift the burden of proof to the respondent.

**Jury Instruction.**

■■■ The legislature has determined that scientific evidence of paternity should be given considerable weight, and has enacted legislation in keeping with that policy decision. The section relevant to this case is § 767.48(1m), STATS., 1993–94, which during the course of this action provided:

> [I]f the blood tests show that the alleged father is not excluded and that the statistical probability of the alleged father's parentage is 99.0% or higher, the alleged father shall be rebuttably presumed to be the child's parent.[7]

When the requirements of § 767.48(1m) are met, the petitioner is entitled to a jury instruction which rebuttably presumes the respondent is the biological father.[8] In order to determine whether the evidence submitted by the State and Lisa entitles them to the requested jury instruction, we must construe whether the statutory language, "the statistical probability of

---

[7] The legislature has since replaced the word "blood" with the word "genetic" in the statute. 1995 Wis. Act 100 § 22, effective December 16, 1995. This change does not affect our analysis.

[8] Wisconsin JI-Civil 5001 provides:

> In this case, the genetic test report established a statistical probability of __% that (respondent) is the father of (child). From this genetic test, a presumption arises that (respondent) is the father of (child). But there is evidence in the case which may be believed by you that (respondent) is not the father. You must resolve the conflict. Unless you are convinced to a reasonable certainty by the greater weight of the credible evidence that it is more probable that he is not the father, you must consider this presumption as conclusive evidence of paternity and find that he is the father.

the alleged father's parentage is 99.0% or higher," refers to the statistical probability obtained by combining the results of a series of different types of tests or whether it refers to the probability of each individual test (or some limited number of different types of tests).

When we construe a statute, our aim is to ascertain the intent of the legislature; and, in doing so, our first resort is to the language of the statute itself. *State v. Eichman*, 155 Wis. 2d 552, 566, 456 N.W.2d 143, 149 (1990). We must determine whether a statute is clear and unambiguous on its face or whether the language of a statute is capable of being understood by reasonably well informed persons in two or more ways and is therefore ambiguous. *See D.S. v. Racine County*, 142 Wis. 2d 129, 134, 416 N.W.2d 292, 294 (1987). When a statute is ambiguous, a reviewing court will look to the scope, subject matter and object of the statute to discern the legislative intent. We must interpret the statute to avoid an absurd or unreasonable result. *DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891, 893 (1985).

This court has already determined that § 767.48(1m), STATS., is ambiguous and that the words " 'blood tests'. . . refer to the statistical result of a set of blood samples taken from the mother, child and alleged father, and [that] the presumption applies only where each set of admissible test results is 99.0% or higher." *State ex rel. K.F.K. v. D.P.K.*, 160 Wis. 2d 429, 434, 465 N.W.2d 833, 835 (Ct. App. 1991).[9] However, *K.F.K.*

---

[9] In *K.F.K.*, blood tests initially were conducted in 1982, with the results showing it was "unlikely" that D.P.K. was the biological father. In 1986, the lab which had analyzed the blood samples reported it had made a clerical error in 1982 and that

does not decide the question presented here: whether the "statistical probability" referred to in the statute is the probability produced by combining the results of all the different types of tests that were performed on a set of blood samples, as Lisa and the State contend, or whether each individual type of test (or some limited number of different types of tests) must yield a probability of paternity of 99.0% or greater in order to entitle the petitioner to the presumption of paternity instruction.

We conclude that the term "statistical probability" is ambiguous because it could be understood to mean the results of each individual type of blood test (or some limited number of different types of tests) performed on blood samples taken from the mother, child and putative father, or it could mean the probability which results from combining the results of all of the different types of tests performed on blood samples drawn from the mother, child and putative father.

Each different type of blood test has a different maximum capacity to exclude a potential father. When the different types of blood tests which examine genetic markers are used in combination with one another, their combined statistical probability is greater than their individual parts. *See* Shapiro, *supra* n.3. Because

---

the results of the blood tests it ran actually showed a 97.06% probability of paternity. Subsequently, more tests were done on blood samples from the mother, the child and D.P.K. These tests showed a probability of paternity of 99.45%. The results of both sets of tests were admitted at trial, and no evidence was admitted regarding which blood tests were more accurate or which series of tests were superior. Based on the limited evidence admitted, the trial court did not give the requested presumption. However, as set forth above, the case at hand is factually distinguishable from *K.F.K.*

it was the intent[10] of the legislature to give considerable weight to the scientific advances in the area of genetic testing when it passed § 767.48(1m), STATS., we conclude that the legislature intended the words "statistical probability" to mean the probability determined by combining the results of all of the different types of tests done on blood samples taken from the child, mother and putative father, rather than examining each test individually or placing a limit on the number of different types of tests which may be combined in arriving at the "statistical probability" set forth in § 767.48(1m). Whether the results of the different types of tests are all listed on one report, or are set forth on several different reports and aggregated by a statement that describes their combined statistical probability, is not germane to our decision. Therefore, we conclude the petitioners were entitled to a jury instruction which rebuttably presumed paternity because the statistical probability of paternity derived from combining the results of all of the different test types was at least 99.0% for the tests done in 1988, as well as those done in 1994.

We will reverse and order a new trial if we conclude that the jury instructions were erroneous and prejudicial. *Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10, 16 (1992). A jury instruction error is prejudicial when it probably misled the jury. *Id.* at 850, 485 N.W.2d at 16. If the instructions, taken as a whole,

---

[10] The object of the statutes dealing with paternity is to identify biological fathers of children. As scientific advances have been made which can be of assistance in this regard, the statutes have changed to accommodate them. *See* 1983 Wis. Act 447, § 41; 1987 Wis. Act 27, §§ 2137r to 2137u; 1995 Wis. Act 100, §§ 19 to 29.

correctly state the law, no grounds for reversal exist. *Id.* However, here the results of the different test types performed in 1988 were properly combined into a statistical probability of paternity which exceeded 99.0%. Therefore, pursuant to § 767.48(1m), STATS., the State and Lisa were entitled to a jury instruction that Michael was rebuttably presumed to be Lily's father. Because the instructions given misstated the law, we conclude they probably mislead the jury. Therefore, we reverse and remand for a new trial.[11]

## CONCLUSION

Michael's testimony that he and Lisa never had sexual intercourse was sufficient evidence to survive summary judgment and to sustain the jury verdict finding that he was not Lily's father. However, we remand for a new trial because the jury should have been instructed on the presumption of paternity. In light of our decision, we do not address the issue of attorneys fees.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

---

[11] Upon retrial, the parties may wish to take note of our decision in *Amber J.F. v. Richard B.*, 205 Wis. 2d 505, 557 N.W.2d 84 (Ct. App. 1996) (holding that a child is not barred by claim or issue preclusion doctrines from bringing a second paternity action when she was not made a party to the first action), and consider whether to join Lily as a party.