RANDY A. J., Petitioner-Respondent,

v.

NORMA I. J., Respondent-Co-Appellant-Petitioner,

BRENDAN B., Intervening-Respondent-Appellant-Petitioner.

Supreme Court

*No. 02–0469. Oral argument September 16, 2003.—
Decided April 7, 2004.*

2004 WI 41

(Also reported in 677 N.W.2d 630.)

387

For the respondent-co-appellant-petitioner there were briefs by *Robert J. Welcenbach* and *Welcenbach & Widmann,* Milwaukee, and oral argument by *Robert J. Welcenbach*

For the intervening-respondent-appellant-petitioner there were briefs by *Vicki Zick* and *Zick & Weber Law Offices, LLP,* Johnson Creek, and oral argument by *Jennifer L. Weber.*

For the petitioner-respondent there was a brief by *Matthew J. Price, Loeb & Herman, S.C.,* Milwaukee, *Virginia M. Stuller, Carr, Kulkoski & Stuller, S.C.,* New Berlin, and oral argument by *Matthew J. Price.*

An amicus curiae brief was filed by *D. Byron Goltz, Peter M. Koneazny,* Milwaukee, on behalf of the Legal Aid Society of Milwaukee, Inc.

¶ 1. PATIENCE D. ROGGENSACK, J. This is a

review of a published decision of the court of appeals that affirmed the judgment of the Circuit Court for Waukesha County, Lee S. Dreyfus, Jr., Judge, confirming Randy A.J. as the father of Selena J.

¶ 2. Norma I.J. and Brendan B. contend that the previous court decisions were erroneous because Brendan has a constitutionally protected interest in asserting his paternity of Selena based on genetic tests that show a probability of 99.99% that he is her biological father. They assert the circuit court erred in applying the best interest of the child test under Wis. Stat. § 767.463 (1999–2000)[1] to override his interest as the putative father and the court of appeals erred in using the equitable parent doctrine to affirm the judgment of the circuit court. We conclude that any interest Brendan has in asserting his paternity is not a constitutionally protected interest because he has failed to establish a substantial relationship with Selena. We also conclude that § 767.463 cannot be employed once genetic tests have been completed and that the equitable parent doctrine should not be used in paternity determinations. However, because we also conclude that Norma and Brendan are equitably estopped from asserting the genetic test results as proof to rebut the marital child presumption found in Wis. Stat. § 891.41, that presumption remains intact. Accordingly, we affirm the judgment insofar as it concludes that Selena is Randy's child and he is her father. We also affirm the dismissal of Norma and Brendan's claims in regard to Selena's paternity.

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

## I. BACKGROUND

¶ 3. Randy A.J. and Norma I.J. were married on May 11, 1990. On January 24, 1998, Norma gave birth to a daughter, Selena J. Randy paid all of Selena's birthing expenses and is listed as Selena's father on her birth certificate. However, during the conceptive period, Norma was involved in an adulterous relationship with Brendan B., of which Randy had no knowledge.

¶ 4. Both before and after Selena's birth, Norma saw Brendan several weekends a month when she traveled to Chicago, Illinois, for what she told Randy were modeling jobs for Saks Fifth Avenue. After Selena's birth, Randy continued to pay all of her expenses and to provide a home for her and Norma in Wisconsin. Notwithstanding Norma's reliance on Randy, she did have discussions with Brendan during the pregnancy and after Selena's birth that Brendan might be Selena's biological father.

¶ 5. In 1999, Norma was convicted of embezzlement, and on May 10, 1999, she was sentenced to eight years in prison. It was only then that she told Randy that he might not be Selena's biological father. Until that time, Randy had no thought that he had not fathered Selena.

¶ 6. On August 25, 1999, Brendan filed a paternity action in Illinois, seeking to have an Illinois court declare him to be Selena's father. Randy, who was living in Wisconsin with Selena, was served with a copy of that action.

¶ 7. On September 23, 1999, Randy filed for divorce in Wisconsin, wherein he requested sole legal custody and physical placement of Selena. On October 14, 1999, a temporary custody hearing was held, and although Brendan had been provided with notice, he

did not appear. At that hearing, the court commissioner ordered Brendan to have no contact with Selena and granted temporary sole custody to Randy. On December 6, 1999, Norma counterclaimed, asserting that Selena was not Randy's child and requesting genetic testing. Randy opposed genetic tests. He claimed that he is presumed to be Selena's father and that it is not in her best interest to have a genetic determination of paternity.

¶ 8. On September 22, 2000, for reasons that are not reflected in the record before us, Randy stipulated to an order for genetic tests of Selena, Norma and Brendan, conditioned upon "reserving his right to contest final adjudication of the legal father." On September 26, 2000, the circuit court ordered tests that established a probability of 99.99% that Brendan is Selena's biological father.[2]

¶ 9. On March 5, 2001, again upon a stipulation of the parties, Brendan was permitted to intervene in the divorce action. He asserted that he had tried to have his paternity determined in Illinois, but that the action was dismissed on March 20, 2000, for lack of personal jurisdiction. He asked to have Selena declared his child.

¶ 10. The issue of paternity was tried to the court. It concluded that: (1) Norma was equitably estopped from raising Selena's paternity; (2) Brendan was not equitably estopped; (3) Brendan failed to rebut the

---

[2] While the genetic tests show a high probability that Brendan is Selena's father, they do not conclusively prove that Randy is not her father, as he was never tested. Paternity tests are able only to conclusively exclude a man as a potential father of a child. All other paternity test results must be stated in various degrees of probability of parenthood. *State v. Michael J.W.*, 210 Wis. 2d 132, 138 n.3, 565 N.W.2d 179 (Ct. App. 1997); *see also*, Wis. Stat. §§ 891.41 and 767.48(1m).

marital presumption of Wis. Stat. § 891.41; (4) Wis. Stat. § 767.463 applies to this case; and (5) it is in the best interest of Selena to adjudicate Randy as her legal father. Accordingly, the circuit court dismissed Brendan from the divorce action and dismissed Norma's counterclaim insofar as it related to paternity.

¶ 11. On appeal, the court upheld the circuit court's decision adjudicating Randy as Selena's father, but it did so on different grounds. First, it agreed that Norma was equitably estopped from asserting Brendan's paternity. Second, it concluded that neither Wis. Stat. § 767.458(1m) nor Wis. Stat. § 767.463 was applicable because the genetic tests had already been completed and those statutes may be employed only when genetic tests have not been done. Third, it concluded that the genetic tests had enabled Brendan to rebut the marital presumption set out in Wis. Stat. § 891.41. However, the court also concluded that rebutting the marital presumption merely entitled Brendan to a rebuttal presumption of paternity pursuant to Wis. Stat. § 767.48(1m) that the equitable parent doctrine overcame under the facts of this case. Fourth, it concluded that it was in Selena's best interest to adjudicate Randy as her father, and it affirmed the circuit court's judgment. Brendan and Norma petitioned this court for review, which we granted.

## II. DISCUSSION

A. Standard of Review

¶ 12. This case presents questions of constitutional and statutory interpretation. When we review the constitutional protections that Brendan claims apply to his putative parental status, we do so as a

question of law. *See W.W.W. v. M.C.S.,* 161 Wis. 2d 1015, 1026, 468 N.W.2d 719 (1991). The interpretation of statutes and their applications to uncontested facts are questions of law that we review independent of the court of appeals. *See VanCleve v. City of Marinette,* 2003 WI 2, ¶ 17, 258 Wis. 2d 80, 655 N.W.2d 113. And finally, where the material facts are uncontested, we review whether equitable estoppel lies de novo. *Milas v. Labor Ass'n of Wisconsin, Inc.,* 214 Wis. 2d 1, 8, 571 N.W.2d 656 (1997).

## B. The Parties' Positions

¶ 13. Norma does not dispute the court of appeals conclusion that she is equitably estopped from asserting Brendan's paternity. Instead, she focuses on its use of the equitable parent doctrine, as does Brendan, arguing that it was erroneous because the genetic tests overcame the marital presumption of Wis. Stat. § 891.41. Both she and Brendan also argue that the equitable parent doctrine should not be used to overturn what they assert are parental rights of a constitutional dimension.

¶ 14. On the other hand, Randy and Selena argue that portions of both the circuit court and the court of appeals decisions were correct. They contend that Brendan has no constitutionally protected interest at issue. They also contend that the circuit court was correct in concluding that even when genetic tests have been completed, Wis. Stat. § 767.463 may be used to dismiss a paternity action, if the circuit court determines that to do so is in the child's best interest. And finally, they

contend that the court of appeals was correct in its use of estoppel[3] and the equitable parent doctrine.

## C. Constitutional Underpinnings of Parental Rights

¶ 15. Brendan has asserted that the genetic test results, when combined with his visits with Selena until she was fifteen months old, give him a substantive due process liberty interest in his putative status as Selena's father. The circuit court found that Brendan did not support Selena emotionally or financially; that occasionally buying formula and diapers was insufficient to show his assumption of parental responsibility, as was his failure to assert parental rights either at her birth or at the court hearing in October of 1999 when all of this could have been addressed. Based on these findings, the circuit court concluded Brendan did not have a constitutionally protected interest in his putative paternity. Accordingly, we begin with a review of the jurisprudence bearing on the protections that may be afforded Brendan's putative parental rights.

¶ 16. A parent has a constitutionally protected liberty interest in the "companionship, care, custody,

---

[3] Brendan asks us to ignore this argument because Randy and Selena did not argue equitable estoppel to the court of appeals. However, whether we review an issue is a matter of judicial administration. *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980). Here, the estoppel issue presents as a question of law and was briefed by the parties. Additionally, Randy's consent to the blood tests was conditioned upon his continuing "to contest his parent [sic], custodial and placement rights under applicable case law and statutes, including, but not limited to all aspects of equitable estoppel, and Wis. Stats. 767.485, and 767.24." Accordingly, we do consider equitable estoppel.

and management of his or her children." *Stanley v. Illinois,* 405 U.S. 645, 651 (1972). However, parental status that rises to the level of a constitutionally protected liberty interest does not rest solely on biological factors, but rather, is dependant upon an actual relationship with the child where the parent assumes responsibility for the child's emotional and financial needs. *See W.W.W.,* 161 Wis. 2d at 1031–32. As the Supreme Court has explained, the "paramount interest" is in the welfare of children so that the "rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr v. Robertson,* 463 U.S. 248, 257 (1983). As Justice Stewart observed in *Caban v. Mohammed,* 441 U.S. 380 (1979): "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Id.* at 397 (J. Stewart, dissenting).[4]

■

¶ 17. In *W.W.W.,* in addition to the requisite parental relationship, we also examined the principles of *Michael H. v. Gerald D.,* 491 U.S. 110 (1989), as they relate to the status of a child born during a lawful marriage when a man who is not the husband of the mother claims paternity. *W.W.W.,* 161 Wis. 2d at 1029–30. *Michael H.*'s plurality explained that an important factor in assessing the strength of the putative father's claim to parental rights was whether his relationship to the child was historically protected. *Michael H.* 491 U.S. at 123.[5] In recognition of the separate

---

[4] Even though this quote is from the dissent in *Caban v. Mohammed,* 441 U.S. 380 (1979), it is a principle we have adopted. *See W.W.W. v. M.C.S.,* 161 Wis. 2d 1015, 1031–32 (1991).

[5] As the Supreme Court plurality explained,

interest of the child that was at issue, *Michael H.* explained that a child's position in a lawful marriage warranted protection because it rests upon "the historic respect—indeed, sanctity would not be too strong a term—traditionally accorded to the relationships that develop within the unitary family." *Id.* Additionally, the presumption of legitimacy is a fundamental principle of common law that courts are reluctant to overturn. *Michael H.*, 491 U.S. at 124. In this case, as Brendan seeks to establish rights for himself, his efforts could change Selena's status as a marital child thereby undermining that principle.[6]

¶ 18. While we did not adopt the plurality's position in regard to the necessity of showing that the relationship between the child and the putative father is one that has had historic protection, we examined it carefully. *W.W.W.*, 161 Wis. 2d at 1027–29. We chose not to decide whether that second factor must be fulfilled because W.W.W. did not have a significant relationship

---

Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society . . . . [However], quite to the contrary, our traditions have protected the marital family . . . against the sort of claim Michael asserts.

*Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989).

[6] As the Supreme Court plurality explained:

The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption [of legitimacy] appears to have been an aversion to declaring children illegitimate . . . . A secondary policy concern was the interest in promoting the "peace and tranquility of States and families," . . . a goal that is obviously impaired by facilitating suits against [a] husband . . . asserting that [his] children are illegitimate.

*Id.* at 125.

with the children, C.A.S. and C.D.S., making it unnecessary to reach all of the principles of *Michael H.'s* plurality opinion.[7] *W.W.W.,* 161 Wis. 2d at 1031 n.14. However, we did conclude that W.W.W.'s relationship to C.A.S. and C.D.S. was not historically protected. *Id.* at 1029–30. Furthermore, when determining the level of relationship that is necessary before a putative father may assert parental rights of a constitutional dimension, we returned to the direction given by the Supreme Court in *Stanley*[8] and *Caban,*[9] where the Supreme Court's decisions were driven by the actual responsibility for the child the father had assumed. *W.W.W.,* 161 Wis. 2d at 1031 n.14.

¶ 19. Therefore, in order for Brendan to have the necessary foundation for a constitutionally protected liberty interest in his putative paternity, he would have to have taken affirmative steps to assume his parental

---

[7] As we explain below, our decision here is driven by Brendan's lack of a substantial relationship with Selena.

[8] In *Stanley v. Illinois,* 405 U.S. 645 (1972), one of the earlier Supreme Court cases dealing with whether an unmarried biological father has parental rights that rise to a constitutionally protected level, the court held for Stanley, who lived with his children and their mother, because "nothing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children." *Id.* at 655.

[9] In *Caban v. Mohammed,* 441 U.S. 380 (1979), where the Supreme Court again concluded that the equal protection clause was violated by sex-based distinctions relating to unwed mothers and unwed fathers, the relationship of Caban to his children was critical. Caban's two children were born while he lived with their mother; he was identified as their father on their birth certificates and he contributed to their support. After Caban separated from the children's mother, he continued to see them on a regular basis. *Id.* at 382–83.

responsibilities for Selena. In regard to his relationship with Selena, the circuit court found that Brendan had no substantial relationship with Selena, who is six years old and has lived with Randy as her father all her life. Brendan is not listed as her father on her birth certificate; he was not present at her birth;[10] he did not pay for her birthing expenses; he took no legal steps to assert his paternity until she was fifteen months old when he filed a paternity action in Illinois. When that action was dismissed for lack of jurisdiction, he chose not to proceed in this Wisconsin court action until it had been ongoing for more than two years. And finally, he did not provide for Selena's emotional and financial support, either before or after the genetic tests were performed. Therefore, we conclude that the record fully supports the circuit court's finding.

■

¶ 20. In many ways, Brendan's position is similar to the man who was admitted to be the natural father in *Lehr.* There, the significance of the biological connection was not sufficient to accord a constitutional dimension to Lehr's claim of parenthood because Lehr had not assumed parental responsibility for the child and he was attempting to obtain an opportunity for parentage that conflicted with a similar opportunity for the husband of the child's mother. *Lehr,* 463 U.S. at 262. Additionally, as the Supreme Court further explained in *Michael H.,* a limit is imposed when the mother "is, at the time of the child's conception and birth, married to, and cohabitating with, another man, both of whom wish to raise the child as the offspring of their union." *Michael H.,* 491 U.S. at 129. Here, Randy and Norma

---

[10] He did give Norma a ride to the hospital when she went into premature labor while visiting him.

lived together as husband and wife when Selena was born. Randy has provided for Selena since her birth, emotionally and financially. He has made a home for her and provided her with the status of a marital child for six years, while Brendan has been uninvolved in providing for her daily needs. Accordingly, we conclude that Brendan has not demonstrated a constitutionally protected liberty interest in his putative paternity because he has failed to establish a substantial relationship with Selena.

D. Wisconsin Stat. § 767.463[11]

¶ 21. The circuit court concluded that Wis. Stat. § 767.463 could be employed to dismiss a proceeding involving a child's paternity, even after genetic tests had been performed, if to do so was in the child's best interest. The court of appeals disagreed, concluding that the statute did not apply once blood tests were completed. We agree with the court of appeals.

¶ 22. Wisconsin Stat. § 767.463 states:

Except as provided in s. 767.458(1m), at any time in an action to establish the paternity of a child, upon the

---

[11] All parties concede that Wis. Stat. § 767.458(1m) cannot be employed here because the genetic tests were completed before the circuit court decided whether it was in Selena's best interest to proceed to determine paternity contrary to the marital presumption. We agree with this assessment of the statute's applicability. However, we note that when the paternity of a child born during a lawful marriage is contested by a man who is not the husband of the mother, and the husband of the mother is willing to affirm his status as father of the child, this statute provides safeguards for the child that normally should not be relinquished voluntarily.

motion of a party or guardian ad litem, the court or court commissioner under s. 757.69(3)(g) may, with respect to a man, refuse to order genetic tests, if genetic tests have not yet been taken, and dismiss the action if the court or court commissioner determines that a judicial determination of whether the man is the father of the child is not in the best interest of the child.

When we construe a statute, we attempt to ascertain the intent of the legislature. *State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 121, 561 N.W.2d 729 (1997); *Ball v. District No. 4, Area Bd. of Vocational, Technical & Adult Educ.*, 117 Wis. 2d 529, 537–38, 345 N.W.2d 389 (1984). We begin with the language the legislature chose to use. *Angela M.W.*, 209 Wis. 2d at 121. We give that language its plain and ordinary meaning. *Bruno v. Milwaukee County*, 2003 WI 28, ¶ 20, 260 Wis. 2d 633, 660 N.W.2d 656. If the language is clear on its face, we need go no further and we simply apply it. *Id.* We also construe a statute so that no part of it is surplusage, giving effect to all the words that are used. *Donaldson v. State*, 93 Wis. 2d 306, 315, 286 N.W.2d 817 (1980).

¶ 23. Wisconsin Stat. § 767.463 permits a circuit court to dismiss a paternity action to protect the best interest of a child. It provides that a court may refuse to order genetic tests of "a man." "A man" is a very general designation that could include the husband of the child's mother or a man to whom she was never married. Therefore, we conclude it may be employed when the paternity of a marital or a nonmarital child is at issue. Additionally, the statute provides that it may be employed "at any time," while Wis. Stat. § 767.458(1m) appears to apply at the first court ap-

pearance. Both of these provisions support Selena and Randy's interpretation. However, the balance of the statute does not.

¶ 24. For example, Wis. Stat. § 767.463 appears to state the obvious when it provides that a court may refuse to order requested genetic tests "if genetic tests have not yet been taken." However, we note that the phrase, "if genetic tests have not yet been taken," is set out in the conjunctive with the clause, "dismiss the action," such that grammatically they cannot be read as describing independent tasks that have no necessary link. Stated another way, if each statutory directive could stand alone, there would be no need for the phrase, "if genetic tests have not been taken," as the concept of precluding genetic tests is adequately addressed in the clause empowering a court to refuse to order them. Instead, § 767.463 appears to be patterned on Wis. Stat. § 767.458(1m) that applies only to marital children and permits the dismissal of an action only before the completion of genetic tests.

¶ 25. Furthermore, it makes sense that the legislature would choose to require a best interest hearing before genetic tests are completed, as it permits the child to be the focus of the hearing, without concern about the putative father's rights. That is, the legal issue of the child's best interest may be clouded by facts that could form part of a constitutional claim of paternity when a best interest hearing is held after genetic tests are completed. Use of the best interest hearing in Wis. Stat. § 767.463 prior to genetic testing can avoid that type of problem, a result the plain meaning of the statute supports. And finally, conducting a best interest of the child hearing first could render the taking of blood tests unnecessary. Accordingly, we conclude that the court of appeals correctly interpreted § 767.463. A

401

dismissal of a paternity proceeding based on that statute may not be ordered after genetic tests have been completed.

### E. The Equitable Doctrines

#### 1. Equitable estoppel

¶ 26. Randy and Selena argue that Norma and Brendan are equitably estopped from asserting that Randy is not Selena's father. Equitable estoppel requires proof of three elements: (1) an action or an inaction that induces; (2) reliance by another; and (3) to his or her detriment. *Harms v. Harms,* 174 Wis. 2d 780, 785, 498 N.W.2d 229 (1993). Equitable estoppel has been applied in family law contexts. *Id.* (concluding that equitable estoppel could be applied in a contempt proceeding to show why child support was not in arrears); *J.J. v. R.J.,* 162 Wis. 2d 420, 429, 469 N.W.2d 877 (Ct. App. 1991) (applying equitable estoppel to a mother's action to have the court declare that her husband is not the father of a child born during their marriage); *L.H. v. D.H.,* 142 Wis. 2d 606, 614–15, 419 N.W.2d 283 (Ct. App. 1987) (concluding that equitable estoppel may be available as a defense to a mother's institution of paternity proceedings). Equitable estoppel has also been used to prevent raising a statutory defense in other types of actions. *See Fritsch v. St. Croix Cent. Sch. Dist.,* 183 Wis. 2d 336, 345–46, 515 N.W.2d 328 (Ct. App. 1994) (concluding that a school district was equitably estopped from raising a teacher's failure to comply with the notice of claim requirements of Wis. Stat. § 893.80(1)(b) because of the conduct of the school district's agents).

¶ 27.　Here, two statutes address a presumption of paternity grounded in the results of genetic tests:　Wis. Stat. § 891.41 and Wis. Stat. § 767.48(1m). Section 891.41, which also contains a presumption of paternity based on marriage, states in relevant part:

(1) A man is presumed to be the natural father of a child if any of the following applies:

(a) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties. SU22. . . .

(2) In a legal action or proceeding, a presumption under sub. (1) is rebutted by results of a genetic test . . . that show that a man other than the man presumed to be the father under sub. (1) is not excluded as the father of the child and that the statistical probability of the man's parentage is 99.0% or higher . . . .

And § 767.48(1m) states:

If genetic tests ordered under this section or s. 49.225 show that the alleged father is not excluded and that the statistical probability of the alleged father's parentage is 99.0% or higher, the alleged father shall be rebuttably presumed to be the child's parent.

¶ 28.　Although we have not employed equitable estoppel to preclude rebutting the statutory presumption set out in Wis. Stat. § 891.41 or in Wis. Stat. § 767.48(1m), we have applied it in the past to prevent a party from raising a statutory defense to paternity. For example, in *State ex rel. Susedik v. Knutson,* 52 Wis. 2d 593, 191 N.W.2d 23 (1971), we utilized equitable estoppel to prevent Knutson from raising the five-year statute of limitations then set out in Wis. Stat.

403

§ 893.195 (1969–70), for determinations of paternity. We explained that the issue was whether Knutson's acts were so "unfair and misleading as to outbalance the public's interest in setting a limitation on bringing [paternity] actions." *Id.* at 598. In concluding that they were, we used our equitable powers to prevent unfairness to the child and the mother that would have occurred because of their reliance on Knutson's actions that caused them to delay in bringing a paternity action.[12]

¶ 29. In the case before us, the issue is whether the actions and inactions of Norma and Brendan were so unfair as to preclude them from overcoming the public's interest in the marital presumption of Wis. Stat. § 891.41(1) based on the results of the genetic tests that Brendan took.

¶ 30. Randy and Selena assert they have proved all three elements by uncontradicted evidence, as to both Norma and Brendan. They argue that Norma and Brendan's deceit and lack of action to assert Brendan's putative paternity, which was ongoing all through Norma's pregnancy and until Selena was fifteen months old, caused them to believe Randy is Selena's

---

[12] Many other Wisconsin decisions have applied equitable estoppel to prevent the effect that a statute of limitations would have absent estoppel's use. *See, e.g. , Hester v. Williams,* 117 Wis. 2d 634, 645, 345 N.W.2d 426 (1984); *Policemen's Annuity & Benefit Fund of the City of Milwaukee v. City of Milwaukee,* 2001 WI App 144, ¶ 18, 246 Wis. 2d 196, 630 N.W.2d 236. And *Fritsch v. St. Croix Central School District,* 183 Wis. 2d 336, 344, 515 N.W.2d 328 (Ct. App. 1994), applied it to prevent use of the notice of claim statute to bar a personal injury claim. Courts in other jurisdictions have applied it to a putative father seeking to assert his paternity based on genetic tests. *See, e.g., Richard "W" v. Roberta "Y",* 658 N.Y.S.2d 506 (1997).

father and to develop deep emotional ties with each other. They assert that breaking those ties would be very harmful to Selena, as Randy is the only father she has ever known.[13] Additionally, Brendan and Norma stood silent when Randy paid all of Selena's birthing expenses and met all her financial needs both before and after the genetic tests were performed. Furthermore, Randy has been fully committed to acting as Selena's father. He has organized his life around providing for her care for six years and has provided for her needs, emotionally and financially. And finally, as Randy's daughter, Selena has the status of a marital child.

¶ 31. In contrast, Norma and Brendan have asserted nothing to counter the findings of the circuit court or Selena and Randy's arguments, except for the presumption under Wis. Stat. § 767.48(1m) that Brendan is Selena's biological father based on genetic tests. However, in addition to the reliance that Selena and Randy have shown on the actions and inactions of Norma and Brendan and the unfairness that Norma and Brendan are seeking to repeat here, the circuit court determined that it is in Selena's best interest to adjudicate Randy as Selena's father. We deem the circuit court's determination very significant, and we note that neither Norma nor Brendan contests its accuracy. Furthermore, Wisconsin favors preserving the status of marital children, even when it can be positively shown that the husband of the mother could not have been the

---

[13] During an interview arranged by a psychologist, where Brendan attempted to interact with Selena, she began to cry and asked for her "daddy." When Randy was brought into the room, she continued to cry and repeatedly told Randy she wanted "to go home."

father of the child.[14] Therefore, we conclude that Norma and Brendan's actions and lack of action, which were relied on by both Selena and Randy, are so unfair, that when combined with the state's interest in preserving Selena's status as a marital child, they outbalance the public's interest in a purely biological approach to parenthood. Accordingly, we conclude that Norma and Brendan are equitably estopped from rebutting the marital presumption of Wis. Stat. § 891.41 in regard to Randy's paternity of Selena.[15]

2. Equitable parent doctrine

¶ 32. Randy and Selena also request us to affirm the equitable parent doctrine utilized by the court of appeals. The equitable parent doctrine is generally described as originating in *Atkinson v. Atkinson,* 408 N.W.2d 516 (Mich. App. 1987), where it was employed when equitable estoppel could not be used to prevent the court from ordering a husband to submit to blood tests. *Id.* at 518–19. An "equitable parent" is described

---

[14] *See* Wis. Stat. §§ 767.47(9) and 891.40 (unqualifiedly according the status of "natural father" to the husband of the mother when children are conceived by artificial insemination).

[15] We permit Selena to assert an estoppel defense to the availability of genetic test results to rebut the presumption of Wis. Stat. § 891.41, as well as Wis. Stat. § 767.48(1m), which the court of appeals used. We do so because applying estoppel to § 891.41(1) maintains Selena's status as a marital child. We note that in his brief Randy follows the lead of the court of appeals and presumes that genetic tests that show a 99.99% probability of paternity must always rebut the marital presumption of § 891.41(1). However, the arguments of counsel, while very helpful to us, do not restrict our analysis of the legal issues presented on appeal. *See Waushara County v. Graf,* 166 Wis. 2d 442, 453, 480 N.W.2d 16 (1992).

as one who through judicial determination is able to exercise all the rights and responsibilities of a natural parent. *Id.* at 520. To support the application of the equitable parent doctrine, *Atkinson* required only a person: (1) who wants to be recognized as the child's parent; (2) who is willing to support the child; (3) who wants the rights of custody or visitation in regard to the child; and (4) who raises "certain circumstances," that were otherwise undefined by *Atkinson. Id.* at 519.

¶ 33. We do not employ the equitable parent doctrine because its parameters are too indistinct, permitting its use to create uncertainties in the law. We also do not approve its use because equitable estoppel is a well-established legal principal with definite elements that will address those instances where unfairness in a proceeding would harm children and adults, absent the intervention of the court's equitable powers. *See,* David M. Cotter, *Putting Family Ties First [and] Science Second,* 25 Fam. Advoc. 22 (Fall 2002). And finally, to the extent the equitable parent doctrine has been employed in the past, we preclude its application in the future. *See J.J.,* 162 Wis. 2d at 430.

## III. CONCLUSION

¶ 34. We conclude that any interest Brendan has in asserting his paternity is not a constitutionally protected interest because he has failed to establish a substantial relationship with Selena. We also conclude that Wis. Stat. § 767.463 cannot be employed once genetic tests have been completed and that the equitable parent doctrine should not be used in paternity determinations. However, because we also conclude that Norma and Brendan are equitably estopped from

asserting the genetic test results as proof to rebut the marital child presumption found in Wis. Stat. § 891.41, that presumption remains intact. Accordingly, we affirm the judgment insofar as it concludes that Selena is Randy's child and he is her father. We also affirm the dismissal of Norma and Brendan's claims in regard to Selena's paternity.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 35. N. PATRICK CROOKS, J. *(concurring)*. I agree with the majority opinion's conclusion that the court of appeals' decision, which upheld Selena as the legitimate child of Randy, should be affirmed. However, I write separately because I disagree with the majority's conclusion that Wis. Stat. § 767.463 may not be applied after genetic tests have been performed. Instead, I would apply § 767.463, and consider the best interest of the child, in order to resolve the present case. While I do not disagree with the majority's use of equitable estoppel to arrive at its conclusion, I am satisfied that applying § 767.463 and considering the best interest of Selena is preferable to the majority's approach.

¶ 36. The majority opinion concludes that Wis. Stat. § 767.463 is patterned after Wis. Stat. § 767.458(1m), which applies only to marital children and states that a paternity action may not be dismissed once genetic tests have been performed. *See* majority op., ¶ 24. The majority further contends that, in enacting § 767.463, the legislature intended that a best interest hearing be conducted before genetic tests have been performed, so as to avoid potential constitutional implications that may arise after testing. *Id.* In addi-

tion, the majority notes that the need for genetic tests may be obviated if a best interest determination is made first. *Id.*

¶ 37. I would interpret Wis. Stat. § 767.463 as permitting the dismissal of a paternity action when in the best interest of the child, even after genetic tests have been performed.[1] The clause "if genetic tests have not yet been taken" solely modifies the language preceding it. Because no such modifier is included regarding the dismissal of a paternity action, it appears that a court has discretion to dismiss a case, regardless of whether genetic tests have already been performed. Given the positioning of the modifying clause in the sentence, I would allow a court to dismiss the action even if genetic tests have already been performed. To interpret this language any other way would render the "best interest of the child" provision, under the circumstances here, superfluous. This court has previously stated that each word in a statute must be given effect, so as not to render any part of the statute superfluous. *Landis v. Physicians Ins. Co.,* 2001 WI 86, ¶ 16, 245 Wis. 2d 1, 628 N.W.2d 893.

¶ 38. Moreover, if Wis. Stat. § 767.463 is interpreted to permit dismissal of a paternity action only if genetic tests have not yet been performed, then § 767.463 would essentially serve the same function as Wis. Stat. § 767.458(1m). The inclusion of the modifying clause with respect to the first half of the sentence

---

[1] In relevant part, Wis. Stat. § 767.463 states the following:

(T)he court or circuit or supplemental court commissioner under s. 757.675(2)(g) may, with respect to a man, refuse to order genetic tests, if genetic tests have not yet been taken, and dismiss the action if the court or circuit or supplemental court commissioner determines that a judicial determination of whether the man is the father of the child is not in the best interest of the child.

demonstrates the legislature's intent to achieve an outcome different from that provided for in § 767.458(1m).

¶ 39. I agree with the circuit court's conclusion that Wis. Stat. § 767.463 has a different application than does Wis. Stat. § 767.458(1m). The circuit court aptly noted that the language of § 767.463 does not limit its application to the beginning of an action or prior to genetic testing. Section 767.463 simply grants courts discretion in that they may refuse to order genetic tests if they have not, thus far, been performed.

¶ 40. To read Wis. Stat. § 767.463 as allowing for dismissal only if genetic tests have not been performed is to remove effectively any best interest of the child considerations from the process. This cannot have been the legislature's intent. The best interest of the child is a significant consideration throughout Wisconsin's family law, including paternity matters. *See In re Paternity of R.W.L.,* 116 Wis. 2d 150, 158, 341 N.W.2d 682 (1984) ("(T)he primary interest in the paternity action is that of the child."). In *In re Paternity of C.A.S.,* 161 Wis. 2d 1015, 1036, 468 N.W.2d 719 (1991), we further noted that considering the best interest of the child "reflect(s) a strong public policy of this state." The majority opinion's conclusion that § 767.463 must be read so as to preclude a best interest determination, after genetic tests have been performed, goes against Wisconsin's emphasis on the best interest of the child, and appears to be contrary to the intent of the legislature.

¶ 41. For the foregoing reasons, I respectfully concur.