In re the Paternity of A. R. R.:
Stuart S., Petitioner-Appellant,

v.

Heidi R. and Scott R., Respondents-Respondents.

Court of Appeals

*No. 2014AP1487. Submitted on briefs December 23, 2014.*
*—Decided January 21, 2015.*

2015 WI App 19

(Also reported in 860 N.W.2d 538.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Nicholas V. Davis* of *Williams & Davis*, Amery.

On behalf of the respondents-respondents, the cause was submitted on the brief of *Kathleen M. Gionis* of *Gionis Law Office*, St. Croix Falls.

On behalf of the Guardian ad Litem, there was a brief filed by *Jeffrey R. Kohler*, Spooner.

Before Hoover, P.J., Stark and Hruz, JJ.

¶ 1. STARK, J. Stuart S. appeals an order dismissing his paternity action against Heidi R. and Scott R. Stuart alleges he is the biological father of A.R.R., a child born to Heidi while she was married to Scott. The circuit court dismissed Stuart's paternity action, pursuant to WIS. STAT. § 767.863(1m),[1] concluding a judicial determination that Stuart was A.R.R.'s father would not be in A.R.R.'s best interest. Stuart argues the circuit court erred because § 767.863(1m) allows dismissal based on the child's best interest only before genetic tests have been completed, and in this case genetic tests had already been performed showing a 99.9999996% likelihood that Stuart is A.R.R.'s father. Stuart also asserts dismissal of the paternity action violated his constitutionally protected liberty interest in his putative paternity of A.R.R.

¶ 2. We conclude the circuit court properly dismissed Stuart's paternity action under WIS. STAT. § 767.863(1m). The circuit court correctly disregarded

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

the genetic testing upon which Stuart relies because it was not completed pursuant to court order, and the court properly determined a judicial determination that Stuart was A.R.R.'s father would not be in A.R.R.'s best interest. We also conclude dismissal of the paternity action did not violate Stuart's constitutional rights as A.R.R.'s putative father because his relationship with A.R.R. was not substantial enough to give rise to a constitutionally protected liberty interest. We therefore affirm.

## BACKGROUND

¶ 3. Scott and Heidi were married in 1990. Heidi gave birth to five children during their marriage. Scott initiated divorce proceedings in October 2012. Custody and placement of Scott and Heidi's two youngest children—five-year-old A.R.R. and three-year-old W.R.R.—were contested.

¶ 4. While the divorce was pending, Stuart filed the instant paternity action against Heidi and Scott on May 20, 2013, asserting he was A.R.R.'s biological father. The petition alleged that Heidi and Scott were married, but separated, at the time of A.R.R.'s conception. The petition also asserted that Heidi, Scott, and Stuart had "always known" Stuart was A.R.R.'s biological father, that A.R.R. also knew, and that Stuart had "maintained a father/daughter relationship with [A.R.R.] since she was born[.]" Finally, the petition alleged that Stuart, Heidi, and A.R.R. underwent genetic testing on April 29, 2013, and the results showed a 99.9999996% probability Stuart was A.R.R.'s biological father.[2]

---

[2] Under WIS. STAT. § 891.41(1)(a), a man is presumed to be the natural father of a child if "[h]e and the child's natural

¶ 5. A final hearing was held in the divorce action on June 17, 2013. During that hearing, the circuit court paused to consider a motion filed by Scott in the paternity case for an order prohibiting contact between Stuart and A.R.R. pending the initial hearing in the paternity case.[3] In support of that motion, Scott testified that he and Heidi separated "prior to June of 2006[,]" but they reconciled and began having sexual relations again in about September 2006. They did not immediately resume living together because Heidi had been renting a room from Stuart during the separation, and she told Scott "she had an Internet contract and a Dish TV contract that she wanted to not stick [Stuart] with. So, therefore, she had to stay there and do her chores to pay her bills." At the time, Heidi also owned horses that were kept at Stuart's farm. Scott testified Heidi moved back into the family home sometime before Christmas in 2006. A.R.R. was born in August 2007.

¶ 6. Scott further testified he attended prenatal medical appointments with Heidi and helped her prepare their home for the new baby. He asserted he did

mother are or have been married to each other and the child is conceived or born after marriage and before the granting of a decree of legal separation, annulment or divorce between the parties." However, this presumption is rebutted "by results of a genetic test . . . that show that a man other than the man presumed to be the father . . . is not excluded as the father of the child and that the statistical probability of the man's parentage is 99.0% or higher[.]" WIS. STAT. § 891.41(2); *see also* WIS. STAT. § 767.84(1m).

[3] During the June 17, 2013 hearing, the court began by addressing issues in the divorce case. However, after hearing some testimony in the divorce case, the court changed tack and took testimony regarding Scott's motion for no contact in the paternity case. After hearing testimony on that motion, the court then recommenced proceedings in the divorce case.

not receive any money from Stuart during Heidi's pregnancy. A.R.R. was born in the car on the way to the hospital, while Scott was driving. Stuart was not present for the birth. After a short hospital stay, Scott and Heidi took A.R.R. home and introduced her to their other children. Stuart was not with them when they took A.R.R. home for the first time.

¶ 7. Scott testified he supported A.R.R. during her infancy, providing her with food, clothing, and shelter. He further testified he changed "almost every single diaper" and fed A.R.R. bottles when she was not breastfeeding. According to Scott, Stuart did not have any type of relationship with A.R.R. during her infancy and did not contribute any money for her care.

¶ 8. Scott testified his youngest child with Heidi —W.R.R.—was born when A.R.R. was about eighteen months old. Scott stated he developed close relationships with both girls, and they both referred to him as "daddy." He also testified that, because he worked from home, he was able to care for A.R.R. and W.R.R. "at all times and hours[.]"

¶ 9. Scott testified Heidi began taking A.R.R. to Stuart's farm when A.R.R. was about two years old. Around that time, Scott also began hearing rumors that Stuart was A.R.R.'s father. However, when he confronted Heidi about the rumors, she denied them.

¶ 10. An initial hearing was held in the paternity action on July 23, 2013. At the beginning of the hearing, the circuit court explained:

> This matter is on the calendar today for [a] best interests hearing regarding this proceeding because of the fact that [Scott and Heidi] were husband and wife at the time that [A.R.R.] was conceived and born, he is presumed to be the father of that child, and in order to overcome that presumption to allow the paternity case

to proceed, it will be incumbent upon [Stuart] to show the Court that it's in the child's best interest for that proceeding to go forward.

For the record, at this stage of the proceedings, I understand that genetic testing was done entirely on [Stuart's] part, along with [Heidi], which did produce the result indicating that [Stuart] biologically appears to be the father of [A.R.R.]; however, that particular test result is not relevant to these proceedings. That's only going to come into play once the Court makes the determination that it's in the child's best interest to have a formal determination of paternity to overcome the statutory presumption.

¶ 11. Scott provided additional testimony during the July 23 hearing. In particular, he explained that his family moved closer to Stuart's residence when A.R.R. was about three or four, and when A.R.R. was four, Heidi started sending her to Stuart's house alone. He also testified that, in about May 2012, A.R.R. started asking to use his phone "a couple times a week" to call Stuart and ask to visit his farm. A.R.R. began staying overnight at Stuart's residence sometime in 2012. Scott stated he was uncomfortable with these overnight visits, but he permitted them because he was in a "manipulative marriage[.]"

¶ 12. The initial hearing in the paternity action continued on February 24, 2014. Heidi testified A.R.R. was conceived in November 2006, and Stuart is her biological father. Heidi asserted she was separated from Scott at the time of conception, and she was between two and four months pregnant when she moved back into the family home. She also asserted Scott knew Stuart was A.R.R.'s father when they reconciled, and he agreed that Stuart could have access to A.R.R. in order to build a relationship with her.

¶ 13. Heidi conceded Scott attended prenatal medical appointments with her, and Stuart did not. She also conceded Stuart did not come to the hospital when A.R.R. was born, even though she invited him to do so. Heidi admitted she allowed her other children to believe Scott was A.R.R.'s father. She also admitted A.R.R. had a "great" relationship with her younger sister, W.R.R.

¶ 14. Heidi testified she first brought A.R.R. to Stuart's farm shortly after A.R.R. was born. She continued visiting Stuart's farm with A.R.R. "bidaily" during the first year of A.R.R.'s life—both because she had animals there and because she wanted Stuart to see his daughter. Heidi testified she and Scott moved in across the street from Stuart when A.R.R. was two, and after that A.R.R. saw Stuart "almost daily." She also testified Stuart would visit her home and read A.R.R. books. In 2009, A.R.R. began staying overnight at Stuart's house on a regular basis.

¶ 15. Heidi conceded Stuart never fed A.R.R. when she was less than two years old and never changed her diapers. However, Heidi asserted Stuart later began feeding and bathing A.R.R. when she visited his farm. Heidi further testified Stuart paid her between $200 and $600 each month to support A.R.R., and Scott knew about the payments. She also stated Stuart purchased birthday and Christmas presents for A.R.R. after she turned two. In addition, Heidi asserted A.R.R. spent some holidays with Stuart and his family and developed relationships with Stuart's siblings.

¶ 16. Heidi testified A.R.R. began referring to Stuart as "dad" when she was about two or three. As of February 2014, A.R.R. called both Scott and Stuart "dad," and she also referred to them by their first names. However, Heidi asserted A.R.R. had more father-daughter contact with Stuart than with Scott.

¶ 17. Stuart testified Heidi first brought A.R.R. to visit his farm when A.R.R. was three days old. He asserted Heidi and A.R.R. visited him every other day until A.R.R. was about one year old. He changed A.R.R.'s diapers "about two times[,]" but then he "said that's enough of that." A.R.R. began staying overnight at his house in 2009, when she was about two-and-a-half years old. They went swimming together and attended horse auctions, garage sales, flea markets, and church services. Stuart testified he paid Heidi cash on a monthly basis to support A.R.R., and he purchased birthday and Christmas presents for her. He also testified he and A.R.R. hug and kiss each other in a manner characteristic of a father and daughter.

¶ 18. Stuart conceded he did not attend any prenatal medical appointments while Heidi was pregnant with A.R.R., and he was not present for her birth. Although he had health insurance through his employer, he did not check to see whether that insurance would cover Heidi's birthing expenses. He never attempted to add A.R.R. to his health insurance. In addition, he never attended any of A.R.R.'s medical or dental appointments.

¶ 19. Stuart further conceded he did not have any overnights with A.R.R. during the first two and one-half years of her life, and, as a result, he was not responsible for middle-of-the-night feedings, and he did not care for A.R.R. when she woke with stomachaches or earaches. He admitted he was not present at A.R.R.'s baptism, and, in fact, he did not know whether she had been baptized. He also admitted he had never dropped A.R.R. off or picked her up from preschool, and he did not pay for her preschool. Finally, Stuart conceded he did not take any steps to claim paternity of A.R.R. until April or

May of 2013, and before that time he never informed Scott he believed he was A.R.R.'s father.

¶ 20. At the close of the proceedings on February 24, Scott and Stuart disputed the significance of the genetic test results showing a 99.9999996% likelihood that Stuart is A.R.R.'s biological father. Scott argued the test results were irrelevant because the issue for the court was whether allowing the paternity action to proceed was in A.R.R.'s best interest. Stuart disagreed, asserting the court could not dismiss the paternity action based on A.R.R.'s best interest under Wis. Stat. § 767.863(1m) after genetic tests were performed. The circuit court concluded that, "[f]or purposes of . . . abbreviating the proceeding[,]" it would simply "take judicial notice of the fact that there has been a genetic test done, which does show that [Stuart] is at least a pu[ta]tive father for [A.R.R.]."

¶ 21. The initial hearing continued on the following day, February 25, 2014. On that date, A.R.R.'s guardian ad litem (GAL) moved to dismiss the paternity action, asserting a judicial determination that Stuart was A.R.R.'s father would not be in A.R.R.'s best interest. The GAL emphasized that allowing the paternity action to proceed could result in Stuart receiving physical placement of A.R.R., which could result in "split-[ting] up" A.R.R. and W.R.R. The GAL opined the relationship between A.R.R. and W.R.R. was "of paramount importance[,]" and A.R.R. and W.R.R. had indicated they did not want to be separated. Scott joined the GAL's motion, arguing Stuart had not established a substantial parental relationship with A.R.R.

¶ 22. The circuit court granted the motion to dismiss, pursuant to Wis. Stat. § 767.863(1m), concluding a judicial determination that Stuart was A.R.R.'s father would not be in her best interest. The court noted that

A.R.R. was around six years old and had lived with Scott for the majority of her life. The court also observed that Stuart was not listed as the father on A.R.R.'s birth certificate, was not present at her birth, did not pay any birthing expenses, and did not take any legal steps to assert paternity until A.R.R. was five years old.

¶ 23. The court conceded there was "a substantial amount of testimony" establishing that Stuart had "developed a substantial relationship with [A.R.R.]." However, the court stated, "The real issue that the Court has to grasp is whether that relationship is substantial enough to rise to a level of establishing . . . a father-daughter relationship and to overcome the presumption that the marital father should be the one . . . declared to be the father[.]" The court concluded Stuart's relationship with A.R.R. was not substantial enough to rise to the level of a father-daughter relationship, reasoning Stuart was more like a "Dutch uncle"[4] or "father of convenience" than a true father.

¶ 24. In particular, the court observed that, for the first two and one-half years of A.R.R.'s life, Scott and Heidi "did the heavy lifting" by feeding her, changing her diapers, and being there when she woke in the morning and went to bed at night. In contrast, Stuart "got into the game pretty late." The court conceded Stuart had contact with A.R.R. during the first few years of her life, but it found that contact was "more by convenience or coincidence than anything else[,]" and there would have been significantly less contact "had Heidi not had horses over at his farm[.]"

---

[4] The term "Dutch uncle" commonly means "[o]ne who admonishes or reprimands with great severity and directness[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 705 (unabr. 1993). However, it is undisputed that the circuit court used the term to mean a favorite uncle.

¶ 25. The court also noted that Scott consistently provided financial support for A.R.R., whereas Stuart merely "[p]aid what he felt like, when he wanted to[.]" In particular, the court observed that Stuart had paid considerably less than he would have been required to pay pursuant to the relevant child support guidelines. Furthermore, Stuart had never provided health insurance for A.R.R., "which he would have been obligated to do had the paternity action gone forward right from the get-go."

¶ 26. The court also observed that, if it allowed the paternity action to proceed and Stuart was determined to be A.R.R.'s father, A.R.R. and W.R.R. could ultimately be separated. The court agreed with the GAL that separating the sisters would not be in their best interest.

¶ 27. Finally, the court stated it was "mindful" of the timing of Stuart's paternity action, which was filed during the pendency of Scott and Heidi's divorce proceedings. The court suggested Stuart may have filed the paternity action to "give[] Heidi a leg up in terms of the custody battle, because now if we have two different fathers involved that creates an argument for her to say well, if we are going to keep the kids together, I'm the logical choice." The court noted that, if Stuart's only goal was to preserve his relationship with A.R.R., he could have simply filed a petition for third-party visitation in the divorce case instead of initiating a separate paternity action.

¶ 28. For these reasons, the court concluded allowing the paternity action to proceed would not be in A.R.R.'s best interest. Accordingly, the court entered an order dismissing the paternity action on April 9, 2014. Stuart now appeals.

## DISCUSSION

¶ 29. Stuart raises two arguments on appeal. First, he argues the circuit court erred, as a matter of law, by dismissing his paternity action under Wis. Stat. § 767.863(1m) after genetic tests were performed. Second, he argues dismissal of the paternity action violated his constitutionally protected liberty interest in his putative paternity of A.R.R. We address and reject these arguments in turn.

### I. Dismissal under Wis. Stat. § 767.863(1m)

██

¶ 30. The circuit court concluded a judicial determination that Stuart was A.R.R.'s father would not be in her best interest, and it therefore dismissed Stuart's paternity action under Wis. Stat. § 767.863(1m).[5] Section 767.863 governs first appearances in paternity actions. Subsection (1m) of the statute provides:

> In an action to establish the paternity of a child who was born to a woman while she was married, if a male other than the woman's husband alleges that he, not the husband, is the child's father, a party may allege that a judicial determination that a male other than the husband is the father is not in the best interest of

---

[5] Scott and the GAL assert that, instead of dismissing the paternity action based on A.R.R.'s best interest under Wis. Stat. § 767.863(1m), the circuit court concluded the paternity action was barred by equitable estoppel. However, the circuit court's oral ruling makes it clear the dismissal was based on § 767.863(1m), and the court specifically disclaimed any reliance on equitable estoppel. Because we agree with the circuit court that dismissal under § 767.863(1m) was proper, we need not address the equitable estoppel argument that Scott and the GAL advance on appeal.

the child. If the court or a supplemental court commissioner under s. 757.675(2)(g) determines that a judicial determination of whether a male other than the husband is the father is not in the best interest of the child, no genetic tests may be ordered and the action shall be dismissed.

Sec. 767.863(1m). Stuart argues a circuit court may dismiss a paternity action based on the child's best interest under § 767.863(1m) only if genetic tests have not yet been performed. He therefore asserts the circuit court was precluded from dismissing his paternity action under § 767.863(1m) because genetic tests had already been performed showing a 99.9999996% likelihood he is A.R.R.'s father.[6]

¶ 31. Statutory interpretation presents a question of law that we review independently. *Randy A.J. v. Norma I.J.*, 2004 WI 41, ¶ 12, 270 Wis. 2d 384, 677 N.W.2d 630. Our goal in interpreting a statute is to ascertain the legislature's intent. *Id.*, ¶ 22. We begin with the language of the statute, giving that language its plain and ordinary meaning. *Id.* We interpret statutes in context, and reasonably, to avoid absurd results. *State ex rel. Kalal v. Circuit Court for Dane*

---

[6] In his brief-in-chief, Stuart does not challenge the circuit court's conclusion that a judicial determination that he is A.R.R.'s father would not be in her best interest. He argues only that the court erred as a matter of law by dismissing the paternity action under Wis. Stat. § 767.863(1m) after genetic tests were performed. For the first time in his reply brief, Stuart asserts he "does not concede that it would run contrary to [A.R.R.'s] best interests to have him declared her father." However, we need not consider arguments raised for the first time in a reply brief, *see A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998), and we decline to do so here.

*Cnty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. If statutory language is clear on its face, we simply apply it as written without consulting extrinsic sources of interpretation, such as legislative history. *See id.*

¶ 32. Here, Stuart's interpretation of WIS. STAT. § 767.863(1m) is not supported by the plain language of the statute. The relevant portion of the statute simply states that, if a court determines a judicial determination that a male other than the husband is the child's father would not be in the child's best interest, "no genetic tests may be ordered and the action shall be dismissed." Sec. 767.863(1m). The plain language of the statute does not limit the court's authority to dismiss paternity actions to cases in which no genetic tests have been performed.

¶ 33. Nonetheless, Stuart argues *Randy A.J.*, which interpreted a different statute, supports his interpretation of WIS. STAT. § 767.863(1m). There, Norma I.J. gave birth to Selena while married to Randy A.J. *Randy A.J.*, 270 Wis. 2d 384, ¶ 3. The following year, Brendan B. filed a paternity action in Illinois, seeking a declaration that he was Selena's father. *Id.*, ¶ 6. Shortly thereafter, Randy filed for divorce in Wisconsin, seeking sole legal custody and physical placement of Selena. *Id.*, ¶ 7. Randy stipulated that the circuit court in the divorce case could order genetic tests of Selena, Norma, and Brendan, but he reserved his right to " 'contest final adjudication of the legal father.' " *Id.*, ¶ 8. The court then ordered genetic tests, which established a 99.99% probability that Brendan was Selena's biological father. *Id.* Brendan was subsequently allowed to intervene in the divorce action. *Id.*, ¶ 9. However, the court later dismissed Brendan, concluding it would not be in Selena's best interest for him to be adjudicated her father.

*Id.*, ¶ 10. The court relied on WIS. STAT. § 767.855,[7] which provides:

> Except as provided in s. 767.863(1m), at any time in an action to establish the paternity of a child, upon the motion of a party or guardian ad litem, the court . . . may, with respect to a male, refuse to order genetic tests, if genetic tests have not yet been taken, and dismiss the action if the court . . . determines that a judicial determination of whether the male is the father of the child is not in the best interest of the child.

¶ 34. On appeal, our supreme court concluded that "dismissal of a paternity proceeding based on [WIS. STAT. § 767.855] may not be ordered after genetic tests have been completed." *Randy A.J.*, 270 Wis. 2d 384, ¶ 25. The court reasoned the statutory phrase "if genetic tests have not yet been taken" modified both a circuit court's authority to refuse to order genetic tests and its authority to dismiss paternity actions. *Id.*, ¶ 24. The court further explained:

> [I]t makes sense that the legislature would choose to require a best interest hearing before genetic tests are completed, as it permits the child to be the focus of the hearing, without concern about the putative father's rights. That is, the legal issue of the child's best interest may be clouded by facts that could form part of a constitutional claim of paternity when a best interest

---

[7] When *Randy A.J. v. Norma I.J.*, 2004 WI 41, 270 Wis. 2d 384, 677 N.W.2d 630, was decided, WIS. STAT. § 767.855 was numbered WIS. STAT. § 767.463, and WIS. STAT. § 767.863(1m) was numbered WIS. STAT. § 767.458(1m). The statutes were renumbered in 2005. *See* 2005 Wis. Act 443, §§ 198, 202. The substance of the statutes has not changed since *Randy A.J.* was decided. For ease of reading, we therefore use the current statute numbers in our discussion of *Randy A.J.*

hearing is held after genetic tests are completed. Use of the best interest hearing in [Wis. Stat. § 767.855] prior to genetic testing can avoid that type of problem, a result the plain meaning of the statute supports. And finally, conducting a best interest of the child hearing first could render the taking of blood tests unnecessary.

*Id.*, ¶ 25.

¶ 35. *Randy A.J.* is distinguishable because it interpreted a different statute than the one at issue in this case. The two statutes, although similar, are not identical. For instance, Wis. Stat. § 767.855, which the *Randy A.J.* court interpreted, applies, "at any time in an action to establish the paternity of a child[.]" In contrast, Wis. Stat. § 767.863(1m) applies only at the first appearance. More importantly, unlike § 767.863(1m), § 767.855 contains the phrase "if genetic tests have not yet been taken[.]" The *Randy A.J.* court relied heavily on that phrase in support of its conclusion that § 767.855 did not permit dismissal of a paternity action after genetic tests were performed.

¶ 36. Stuart concedes *Randy A.J.* did not directly address Wis. Stat. § 767.863(1m), but he asserts two statements in the court's opinion suggest its holding is equally applicable to that statute. First, in a footnote, the *Randy A.J.* court stated:

All parties concede that [Wis. Stat. § 767.863(1m)] cannot be employed here because the genetic tests were completed before the circuit court decided whether it was in Selena's best interest to proceed to determine paternity contrary to the marital presumption. We agree with this assessment of the statute's applicability.

*Randy A.J.*, 270 Wis. 2d 384, ¶ 20 n.11. Later, the court stated that Wis. Stat. § 767.855 "appears to be patterned on [§ 767.863(1m)] that applies only to mari-

tal children and permits the dismissal of an action only before the completion of genetic tests." *Randy A.J.*, 270 Wis. 2d 384, ¶ 24. Based on these statements, Stuart argues that, even though *Randy A.J.* did not directly address § 767.863(1m), the court clearly believed that statute did not permit dismissal of a paternity action after the completion of genetic tests.

¶ 37. However, the *Randy A.J.* court's statements about WIS. STAT. § 767.863(1m) must be read in light of the fact that the genetic tests performed in that case were court-ordered based upon a stipulation by the parties. Thus, when the *Randy A.J.* court stated it agreed with the parties that § 767.863(1m) could not be employed because genetic tests had already been completed, it was referring to court-ordered genetic tests. The *Randy A.J.* court was not presented with a situation, like the one in this case, in which certain parties took it upon themselves to have genetic tests performed without all parties' consent or the court's approval. In fact, in this case, the genetic tests were performed before the paternity action was even filed. As a result, the circuit court never had the opportunity to determine before the tests were performed whether a judicial determination that Stuart is A.R.R.'s father would be in her best interest. We do not believe the legislature, in enacting § 767.863(1m), intended to allow parties to circumvent a court's authority to dismiss paternity actions at the initial stage of the proceeding based on the child's best interest by preemptively obtaining genetic testing without court approval.

¶ 38. Another statement from *Randy A.J.* supports our interpretation. Although the *Randy A.J.* court agreed with the parties that WIS. STAT. § 767.863(1m) did not apply under the circumstances, it nevertheless cautioned, "[W]hen the paternity of a child born during

406

a lawful marriage is contested by a man who is not the husband of the mother, and the husband of the mother is willing to affirm his status as father of the child, [§ 767.863(1m)] provides safeguards for the child that normally should not be relinquished voluntarily." *Randy A.J.*, 270 Wis. 2d 384, ¶ 20 n.11. The court was clearly concerned that, by stipulating to an order for genetic tests, the parties had circumvented the best interest determination that otherwise would have been required under § 767.863(1m). That concern is even stronger here, where the genetic tests were performed without all parties' knowledge and consent and without court approval.

¶ 39. In addition, the *Randy A.J.* court listed several reasons why it "ma[de] sense" that the legislature would choose to require a best interest hearing before the completion of genetic tests. *See Randy A.J.*, 270 Wis. 2d 384, ¶ 25. In particular, the court observed that holding the best interest hearing first permits the child to be the focus of the hearing, rather than the putative father, and may render genetic testing unnecessary. *See id.* These considerations further support our conclusion that parties should not be able to circumvent the procedure designed by the legislature by preemptively obtaining genetic tests without court approval.

¶ 40. We therefore conclude that, under the circumstances of this case, the circuit court did not err by dismissing Stuart's paternity action under WIS. STAT. § 767.863(1m) after genetic tests were performed.

## II. Constitutionally protected liberty interest

██

¶ 41. Stuart next argues the dismissal of his paternity action violated his constitutionally protected

liberty interest in his putative paternity of A.R.R. Whether a putative parent has a constitutionally protected liberty interest is a question of law that we review independently. *Randy A.J.*, 270 Wis. 2d 384, ¶ 12.

■■■■

¶ 42. As a general matter, a parent has a "constitutionally protected liberty interest in the 'companionship, care, custody, and management of his or her children.' " *Id.*, ¶ 16 (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). However,

> parental status that rises to the level of a constitutionally protected liberty interest does not rest solely on biological factors, but rather, is depend[e]nt upon an actual relationship with the child where the parent assumes responsibility for the child's emotional and financial needs. *See* [*W.W.W. v. M.C.S.*, 161 Wis. 2d 1015, 1031–32, 468 N.W.2d 719 (1991)]. As the Supreme Court has explained, the "paramount interest" is in the welfare of children so that the "rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr v. Robertson*, [463 U.S. 248, 257 (1983)]. As Justice Stewart observed in *Caban v. Mohammed*, [441 U.S. 380 (1979)]: "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Id.* [at 397] (J. Stewart, dissenting).

*Randy A.J.*, 270 Wis. 2d 384, ¶ 16.

¶ 43. In *Randy A.J.*, the court concluded the putative father, Brendan, did not have a constitutionally protected liberty interest in his putative paternity, despite the fact that genetic tests showed a 99.99% probability he was the child's biological father. The court reasoned Brendan had failed to establish a "substantial relationship" with the child because he

did not take "affirmative steps to assume his parental responsibilities for [her]." *Id.*, ¶¶ 19–20. The court noted the child was six years old and had lived with another man as her father for her entire life; Brendan was not listed as the father on the child's birth certificate; he was not present at her birth; he did not pay for her birthing expenses; he took no steps to assert his paternity until she was fifteen months old; and he had never provided for her emotional or financial support. *Id.*, ¶ 19.

¶ 44. Here, the circuit court took judicial notice of genetic test results showing a 99.9999996% likelihood Stuart is A.R.R.'s biological father. The court also observed that this case was "significantly different" from *Randy A.J.* because the evidence showed that Stuart had developed a "substantial relationship" with A.R.R. Stuart argues these two findings establish that he had a constitutionally protected liberty interest in his putative paternity of A.R.R. As a result, he argues the circuit court erred by dismissing his paternity action "without regard to his constitutional rights."

¶ 45. Stuart seizes on the circuit court's use of the term "substantial relationship." However, while the court characterized Stuart's relationship with A.R.R. as "substantial," it ultimately concluded the relationship was not "substantial enough" to be afforded protection. The court highlighted the following facts in support of this conclusion:

- A.R.R. had lived with Scott for most of her life;

- Stuart was not listed as A.R.R.'s father on her birth certificate, was not present for her birth, and did not take any steps to assert paternity until she was five years old;

- Stuart did not perform any day-to-day parenting responsibilities during the first two and one-half years of A.R.R.'s life;
- Although Stuart provided some financial support for A.R.R., he paid "what he felt like, when he wanted to[,]" which was less than he would have been required to pay under the applicable child support guidelines;
- Stuart never provided health insurance for A.R.R.;
- The timing of the paternity action appeared to be motivated by a desire to give Heidi an advantage in the pending divorce case; and
- Stuart was more like a "father of convenience" than a true father.

These findings are amply supported by the record and compel a conclusion that Stuart's relationship with A.R.R. was not substantial enough to give rise to a constitutionally protected liberty interest in his putative paternity.

¶ 46. The circuit court made an unfortunate choice of words when it stated Stuart had shown a "substantial relationship" with A.R.R. However, it is the nature of the relationship, not the label given to it by a court, that gives rise to constitutional protection. Here, despite describing the relationship as "substantial," the circuit court clearly concluded the relationship was not "substantial enough" to warrant protection. We agree with that conclusion, based on the circuit court's factual findings, and, accordingly, we reject Stuart's argument that he established a constitutionally protected liberty interest in his putative paternity of A.R.R.

*By the Court.*—Order affirmed.